July 30, 2025

|               |     |
| ------------- | --- |
| State         | :   |
| v.            | :   |
| Matthew Peckham. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Matthew Peckham. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.**  The defendant, Matthew Peckham (defendant), appeals from a judgment of conviction following a jury trial at which he was found guilty of three counts of assault with a dangerous weapon (counts 1-3), conspiracy to commit assault with a dangerous weapon (count 4), drive-by shooting (count 12), and conspiracy to commit a drive-by shooting (count 13).  The defendant was thereafter sentenced concurrently to five years each on counts 1 through 4; twenty years with eight years to serve on count 12; and ten years suspended with probation on count 13.  Before this Court, the defendant argues that (1) the trial justice abused her discretion in not admitting the juvenile record of a witness at trial; (2) the trial justice abused her discretion in improperly admitting hearsay evidence; (3) the trial justice erred in denying his motion for a new trial; and (4) the trial justice erred in denying his motion for a judgment of acquittal.

- 1 -

## Facts and Procedural History

We recite the following summary of relevant facts, which appear in the record of the proceedings of the Superior Court.

On September 12, 2020, defendant was hanging out with Tyler Smith (Tyler), Skyler Poznanski (Skyler), Emily Bergantine (Emily), Joseph Flynn (JoJo), Corey Flynn (Corey), and two others (collectively, the group) at Tyler's house in North Providence.[1] The group left the house between 11 and 11:30 p.m. with defendant driving everyone in his Chevy Equinox (Equinox). At around midnight, the group came into contact with Marvin Alvarez (Marvin), Joseph Alves (Joe), Chris Alves (Chris), and Marvin's girlfriend on High Service Avenue near Fatima Hospital. Marvin, Joe, and Chris exited their vehicle and approached defendant's Equinox. Skyler fired a Hi-Point 9mm Luger from the rear passenger window of defendant's Equinox, injuring Joe and Chris. Marvin was also shot, but the bullet went through his pant leg and he was not injured.

Officers from the North Providence Police Department responded to the scene of the shooting at approximately 12:15 a.m. on September 13, 2020. The first officer on the scene questioned Marvin and his girlfriend and identified defendant as a suspect. Detective Matthew Phelan (Det. Phelan) and Detective Christopher Cote

---

[1] We will refer to the individuals involved by their first names because several of them share the same last name; we intend no disrespect.

- 2 -

(Det. Cote) also arrived on scene in the early morning hours of September 13. Detective Phelan conducted a physical search of the area, while Det. Cote spoke with Chris and Joe at the hospital. The search of the area yielded two spent shell casings, and the interview with Chris and Joe indicated that defendant and Skyler were suspects in the shooting. Detective Cote returned to the police station and obtained photographs of defendant and Skyler from social media, which he then used to conduct a photo array with Joe. After conducting the photo array, Det. Cote drafted arrest warrants for defendant and Skyler.

Further questioning of Marvin and his girlfriend revealed defendant's cell phone number and that defendant's Equinox was involved in the shooting. Detective Phelan obtained location information for defendant through defendant's cell phone carrier and traced defendant to a motel in Somerset, Massachusetts. The Massachusetts State Police, assisted by the Somerset Police Department, responded to the motel and arrested defendant and Skyler. Detective Phelan learned that the firearm allegedly used in the shooting was in a rented Dodge Charger (Charger) that was parked a few blocks away from Tyler's house. Detective Raymond Nardolillo conducted a search of the Charger and recovered from the trunk two firearms, including a Hi-Point 9mm Luger; some rounds of ammunition; and a firearm magazine. The Rhode Island State Crime Laboratory determined that the discharged

shell casings recovered from the scene of the shooting were a match to the Hi-Point 9mm Luger recovered from the Charger.

Detective Phelan interviewed defendant and Skyler and learned that defendant had rented the Charger in which the firearms were stored. In his interview, defendant stated that Skyler was the shooter and that Tyler possessed a firearm on his person at the time of the shooting as well. During Skyler's interview, Skyler admitted that he "f'd up." At this point in the investigation, Det. Phelan believed that defendant, Skyler, Tyler, JoJo, and Emily were suspects.

On May 26, 2021, the state filed a fifteen-count information in Providence County Superior Court charging defendant with three counts of assault with a dangerous weapon (counts 1-3), conspiracy to commit assault with a dangerous weapon (count 4), three counts of assault with intent to commit murder (counts 5-7), conspiracy to commit assault with the intent to commit murder (count 8), drive-by shooting (count 12), and conspiracy to commit a drive-by shooting (count 13). The criminal information also charged Tyler, Skyler, and JoJo with the same or similar offenses. Tyler later entered a plea of nolo contendere to his charge of possession of a firearm without a license. Skyler also entered a plea on several of his charges.

A trial on defendant's charges commenced on October 11, 2022. Seven witnesses testified for the state; and defendant testified as the sole witness in his case-in-chief. The trial testimony pertinent to this appeal follows.

Emily testified that she was seventeen years old at the time of the shooting and nineteen years old at the time of trial. She shared that, on the evening of September 12, 2020, the group left Tyler's house to go to a cigarette store nearby. Emily explained that defendant drove; she sat in the front passenger seat with Skyler sitting directly behind her in the backseat and Tyler to his left. She stated that another member of the group and JoJo sat to Tyler's left in the back seat; Corey and the eighth member of the group sat in the trunk.

Emily testified that defendant drove for a while and turned onto a back street in a residential area that was not in the direction of the cigarette store. Once on the back street, Emily stated that defendant directed Skyler and Corey to get out and go see if Marvin was in a vehicle parked up the street in front of Marvin's mother's house. When Skyler and Corey returned to defendant's Equinox after a few minutes, Emily recounted, defendant proceeded to drive toward the parked vehicle, parked directly behind it, and called Marvin's phone repeatedly; Marvin did not answer. Emily recalled that, after defendant parked behind the vehicle in front of Marvin's mother's house, the vehicle drove off. A chase ensued with the vehicle and the Equinox ultimately coming to a stop near a hospital. Three people exited the other vehicle and approached Emily's passenger side window. Emily testified that defendant said to "do something" and specifically directed Skyler to "shoot 'em."

Emily explained that Skyler stood in the door of defendant's Equinox and fired three shots from above the door window, striking one of the men in the arm and another in the leg. Emily testified that defendant sped off and headed back to Tyler's house, where Tyler and Skyler put the firearms in the trunk of Tyler's rental car. She stated that Tyler and Skyler parked the rental car a couple of streets away from Tyler's house. Emily testified that the group then decided to go to Massachusetts because Tyler was worried that his house would be raided by police. Emily recalled that the group stayed at a motel in Massachusetts overnight; and that the police arrived the next day, arrested Skyler, and handcuffed her, defendant, Tyler, and another member of the group. She testified that the police later removed the handcuffs from her at the motel and allowed her to leave. Emily testified that she was interviewed by police about the shooting at a later date.

On cross-examination, Emily testified that, with respect to the evening of September 12, she was not aware that defendant wanted to retrieve his keys from Marvin. Emily also testified that she was arrested a couple of weeks after September 13. When counsel for defendant sought to question Emily further about the resulting charges, however, the trial justice sustained an objection by the state that any charges would have been sealed, only to be disclosed with permission of the Family Court.

Defense counsel thereafter provided Emily with a transcript of her police interview dated November 22, 2021. He questioned her about various statements

that she made to the police during the interview as compared to her trial testimony, including: whether defendant and Marvin were in a committed relationship; whether, on the night of shooting, defendant had simply looked back at Skyler, who fired without direction, or whether defendant had directed Skyler to shoot; whether only defendant directed the shooting or defendant and others gave the direction; and whether the direction was to "shoot 'em" or to "shoot him." Emily denied that she was promised anything in exchange for her trial testimony and testified that she came to trial on her own accord.

On redirect examination, Emily clarified that she heard Tyler, JoJo, and defendant say to "shoot 'em." After some back and forth on recross-examination regarding who said to "shoot 'em[,]" Emily testified that defendant told Skyler to "do something" and to "shoot 'em[,]" ultimately maintaining that defendant directed Skyler to shoot.

Chris testified that, at about 11 p.m. on September 12, he was with his brother Joe when they ran into Joe's old friend Marvin and Marvin's girlfriend. Marvin asked for a ride home and Chris agreed to take him and his girlfriend to Marvin's mother's house. After arriving at Marvin's mother's house, Chris parked and they sat in front of the house in Chris's vehicle for approximately fifteen minutes. During that time, Marvin received a phone call; Chris testified that Marvin's tone became aggressive and that he began yelling while on the phone. Chris testified that he

began to drive away from Marvin's mother's house as he listened to Marvin on the phone. He also testified, over the objection of defendant, that he drove away from Marvin's mother's house because he heard Marvin mention a "blinky"[2] during the phone call. Chris testified that he did not know who was on the phone with Marvin, but that he observed an SUV heading toward them and did not feel safe.

Chris explained that he traveled up the street toward Smithfield Road while the SUV followed them within ten feet of Chris's vehicle; Marvin continued arguing over the phone. Chris testified that he turned onto High Service Avenue, and the SUV started beeping its horn. Chris stated that he responded by speeding up and that the SUV continued to follow behind closely. Chris testified that he stopped on High Service Avenue near Fatima Hospital, and that the SUV also stopped approximately fifteen to twenty feet behind. Chris testified that he, Marvin, and Joe exited the car, but that none of them had weapons. Chris recounted that they walked to the passenger side of the SUV parked behind them and that Marvin and Joe starting yelling at the occupants inside. No one in the SUV yelled back, Chris testified, but the back passenger-side window rolled down and a gun protruded from the window; Chris heard four or five shots and immediately ran away. He did not observe who was in the vehicle but said that the SUV sped off after the shooting.

---

[2] Chris testified that he understood "blinky" as a slang term for a gun.

- 8 -

On cross-examination, Chris described Marvin as approaching the SUV aggressively. Chris denied seeing anyone hit the hood of the SUV. Chris's cross-examination testimony revealed some inconsistencies regarding whether the SUV's window went down before shots were fired and whether Marvin's girlfriend exited Chris's vehicle after shots were fired.

Skyler testified that he spent some time with defendant throughout the evening of September 12 at Tyler's house, and that at some point, he noticed defendant's demeanor change. Skyler testified that defendant had become a little agitated and explained that he wanted to get his keys back from Marvin. Skyler testified that defendant specifically asked him to take a ride with defendant to get his keys back from Marvin and that the rest of the group went along too. He testified that, upon arriving at Marvin's mother's house, the group "scoped out" the house; and that defendant noticed that Marvin and a few other individuals were in a parked vehicle outside of the house. Skyler testified, without objection, that defendant followed Marvin's vehicle and called Marvin to tell him to pull over because the group had "blinkies." Skyler testified that defendant "chased" the vehicle for five minutes before the vehicle pulled over. Three males exited the vehicle while yelling, and Skyler testified that he anticipated that a fight would ensue. Skyler recalled hearing several male voices scream to "shoot" and then proceeding to shoot at Marvin, Joe, and Chris from the rear passenger window of defendant's Equinox.

Skyler acknowledged that he gave a statement to the police that was less detailed than his testimony at trial but said that he was initially trying to protect Tyler. When further questioned about why he was testifying with more detail at trial, Skyler responded "[b]ecause * * * I want [defendant] to be held * * * accountable for his actions as well." Skyler stated that he was not promised anything from the state in exchange for his trial testimony.

On cross-examination, Skyler conceded that he did not tell the police in his initial statement that defendant had directed him to shoot; instead, he told the police that he felt threatened, got mad, and "just did it." Skyler testified that he pled to four charges in connection with the shooting but stated that he did not have a cooperation agreement with the state at the time of trial. Skyler acknowledged, however, that he had discussions during plea negotiations about his future ability to seek a reduction in his sentence. On redirect examination, Skyler testified that he met defendant a week before the shooting when defendant, Tyler, and Skyler went to the woods to test out the firearms that were later involved in the shooting.

Joe testified to the same lead-up events as Chris, providing a few extra details, including that the SUV that followed them on September 12 was speeding erratically, riding the edge of Chris's bumper, and beeping its horn. Joe stated that, after coming to a stop outside of Fatima Hospital, he approached the SUV following them and told its occupants to get out of the car to fight; he explained that the

occupants responded by yelling expletives toward him, Chris, and Marvin. Shortly thereafter, Joe recalled that the back passenger-side window of defendant's Equinox lowered and that a gun protruded out and fired four shots toward Joe, Chris, and Marvin.

Tyler, the state's final witness, testified to the same or similar lead-up events on September 12 as Emily and Skyler. Tyler added that defendant told everyone in the backseat of the Equinox to get out and fight Marvin and his friends once both vehicles stopped outside of Fatima Hospital. Tyler recalled, however, that everyone in defendant's Equinox told defendant to drive away. He explained that as defendant got ready to drive away, he heard defendant tell Skyler to shoot them; Skyler complied. Tyler acknowledged that he gave a statement to the police, but omitted much of what he testified to at trial because he was trying to "get out of it" and to protect his friends.

On cross-examination, Tyler expressed certainty about the group having told defendant to drive off before Skyler started shooting. Tyler denied that he ever told Skyler to shoot Marvin and his friends, but insisted that he heard someone say it and said that he believed it was defendant who said it. Tyler admitted that he did not initially tell the police that defendant directed Skyler to shoot because he was scared about the consequences of his own involvement.

- 11 -

The state rested, and defendant moved for a judgment of acquittal on all counts, excluding count 12, pursuant to Rule 29(a) of the Superior Court Rules of Criminal Procedure, which the trial justice denied.

The defendant then testified that he met Skyler for the first time on September 12. The defendant testified that Marvin was his boyfriend, and that he was texting Marvin that evening, seeking the return of his keys. The group filed into defendant's Equinox and headed to Marvin's mother's house; defendant testified that, once they arrived, he noticed Marvin sitting in a vehicle. The defendant called Marvin to demand the return of his keys; when Marvin's vehicle pulled off, defendant followed. As defendant proceeded down the street, defendant explained, he called Marvin again, telling him to stop the vehicle because defendant wanted to retrieve his keys. The defendant testified that, after Marvin stopped his vehicle and defendant did the same, Marvin and two others jumped out of Marvin's vehicle, approached defendant's Equinox, and banged on the hood. He stated that Marvin and one of the others went to the back passenger-side of defendant's Equinox and started yelling to get out of the car because they wanted to fight. The defendant recalled that no one in the Equinox was saying anything at this point, and that he did not hear anyone tell him to drive away. The defendant testified that he proceeded to put the Equinox in drive to try to leave when the window went down and shots rang out. The defendant testified that he left the scene immediately thereafter and never

turned around or looked in the backseat. The defendant recalled that, during the drive back to Tyler's house, Skyler and Tyler were bragging about shooting someone. The defendant testified that, after Tyler and Skyler hid the firearms, the group went to a motel in Massachusetts and spent the night. The defendant testified that, the following morning, multiple police cars surrounded defendant at the motel and arrested both him and Skyler. The defendant testified that he was not aware that anyone in the Equinox had a gun on them at the time of the shooting. The defendant denied ever telling anyone to shoot or to "do something[,]" and stated that he drove off after the shooting because he was scared.

On cross-examination, defendant testified that he and Marvin had been in an open romantic relationship for several months and that he loved Marvin despite knowing that Marvin had girlfriends on the side. The defendant testified that, in addition to texting Marvin about getting his keys back that night, they were also trying to make plans to hang out. The defendant admitted that he got into an argument with Marvin mostly about the keys and denied that the argument was about Marvin declining to hang out. Nonetheless, defendant admitted that he was upset that Marvin did not want to hang out. The defendant denied that he told Skyler to get out of the Equinox to see if Marvin was in the vehicle parked in front of Marvin's mother's house; that he told anyone to shoot or do something; or that he said there were "blinkies" in the Equinox. He maintained that other witnesses who testified to

- 13 -

the contrary were lying. On redirect examination, defendant acknowledged that he had Skyler's number in his phone despite testifying earlier that he met Skyler for the first time on September 12. The state questioned defendant about that issue on recross-examination, and defendant stated that Tyler had put Skyler's number in defendant's phone a few days before the shooting.

The defendant rested his case and renewed his motion for a judgment of acquittal, which the trial justice denied. The jury returned a guilty verdict on counts 1 through 4, 12, and 13. The defendant filed a motion for a new trial, arguing it was required in the interest of justice. The trial justice denied the motion for a new trial and subsequently sentenced defendant to four concurrent sentences of five years each on counts 1 through 4; a twenty-year sentence with eight years to serve and twelve years of probation on count 12; and a ten-year suspended sentence with ten years of probation on count 13. A judgment of conviction entered on June 7, 2023, and defendant filed a timely notice of appeal.

## Discussion

The defendant contends that the trial justice erred in four ways: (1) in not admitting Emily's juvenile record on cross-examination for purposes of exposing that she had a motive to testify untruthfully; (2) in allowing Chris to testify about a "blinky" in violation of Rule 802 of the Rhode Island Rules of Evidence; (3) in

denying defendant's motion for a new trial; and (4) in denying defendant's motion for a judgment of acquittal.

## Limitation of Emily's Testimony about her Juvenile Record

During Emily's cross-examination testimony, she acknowledged that she was arrested a couple of weeks after the incident. However, when counsel for defendant sought to inquire further about the charges, the following objection and colloquy ensued:

> "[PROSECUTOR]: Judge, I'm objecting on the basis that any sort of charge at the time would have been [in] juvenile court, and would have been sealed, and needs to be disclosed with the permission of the Family Court. And to my understanding, no such motion has been provided.
>
> "* * *
>
> "[DEFENSE COUNSEL]: Judge, all I'm looking to do is establish a motive that, in fact, she was charged with something. She is charged with the same crimes as this [d]efendant. That's all I'm looking for. I think I'm entitled to get that out through her.
>
> "THE COURT: Well, he's not looking to get in any document, which demonstrates any record that she has of any arrests or disposition.
>
> "[PROSECUTOR]: * * * [T]he matter came before the Family Court before I got involved and was ultimately dismissed by the office and then is now under seal. And it's my understanding that the rules only allow disclosure of Family Court records * * * for the purpose of sentencing. There's no law, statute, or rule that allows any -- the fact that -- even that they were charged, like, say that she was arrested. * * *

- 15 -

"[DEFENSE COUNSEL]: I'm not looking for her record, I'm looking for her to testify that the fact, the motive for her testimony, was the case was ultimately dismissed.

"THE COURT: But that's the problem, that it is still a record that demonstrates the arrest itself and the dismissal of the case. So you're looking to get in, through her testimony, what you can't get in through any documentation.

"[DEFENSE COUNSEL]: I'm not allowed to get the motive for her testifying today?

"THE COURT: I think because she was a juvenile.

"[DEFENSE COUNSEL]: All right. I object to that. I think it's -- I'm entitled. This is cross-examination. She's testifying.

"THE COURT: I understand that, but cross-examination is also within the rules."

The defendant argues on appeal that the trial justice abused her discretion by not admitting Emily's juvenile record during her cross-examination testimony. He contends that the decision was erroneous for two reasons: (1) as a violation of Rule 609(d) of the Rhode Island Rules of Evidence;[3] and (2) as a violation of defendant's state and federal constitutional right to be confronted with the witnesses against him.

---

[3] Rule 609(d) of the Rhode Island Rules of Evidence authorizes impeachment by evidence of juvenile adjudications under very limited circumstances: courts may

"allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the

- 16 -

## 1. Violation of Rule 609(d) of the Rhode Island Rules of Evidence

The state argues that defendant did not preserve his challenge to the trial justice's refusal to admit Emily's juvenile record as a violation of Rule 609(d). We agree.

It is well settled that, in order to preserve an issue for appellate review, a litigant must raise the issue in the first instance before the trial court. *State v. Tavares*, 312 A.3d 449, 458 (R.I. 2024). To satisfy this requirement with respect to an evidentiary ruling, a litigant's objection must be "sufficiently focused so as to call the trial justice's attention to the basis for said objection." *Id.* (quoting *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016)). We have further observed that the grounds for objection must be specifically stated unless the reason for the objection is evident from the context in which it was made. *Id.* Otherwise, we generally deem the issue waived.

The colloquy that followed the objection by the state plainly demonstrates that defendant did not object in a way that alerted the trial justice to Rule 609 as a basis for admitting evidence of Emily's juvenile charges. Accordingly, defendant's argument under Rule 609 is waived.

court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence."

## 2. Violation of Defendant's Right to Confrontation

Notwithstanding contrary arguments by the state, we are satisfied that defendant did sufficiently alert the trial justice to his specific concern about meaningful cross-examination under the Confrontation Clauses of the United States and Rhode Island Constitutions.

We recognize at the outset that there is incongruity between defendant's Confrontation Clause argument and the specification of error—that the trial justice erred in not admitting Emily's juvenile record on cross-examination. As the pertinent colloquy reveals, defendant did not seek to admit Emily's juvenile record as part of his cross-examination of her. In fact, defendant explicitly said that he was "not looking for her record * * *."

Rather, defendant clearly sought to question Emily about whether her motive to testify was related to the dismissal of her own criminal charges; the constitutional basis for his argument was evident from the context of the colloquy that followed the objection by the state. *See State v. Johnson*, 251 A.3d 872, 884-86 (R.I. 2021) (deciding to address defendant's Confrontation Clause argument where defendant argued at trial that the witness being cross-examined was biased and that the jury was entitled to know this much); *State v. Stansell*, 909 A.2d 505, 510 (R.I. 2006) ("Defense counsel is always permitted to inquire into possible bias or motive of the

- 18 -

state's witnesses."). The Confrontation Clause argument is therefore preserved for appellate review.

"In situations in which the trial justice does not totally prevent or completely prohibit the defendant from exploring the issues of motive, bias, or prejudice of the witness, we employ an abuse-of-discretion standard on review." *State v. Oliveira*, 882 A.2d 1097, 1122 (R.I. 2005). "A trial justice's exercise of discretion to limit the scope of cross-examination 'is not reviewable except for clear abuse, and only if it constitutes prejudicial error.'" *State v. Lomba*, 37 A.3d 615, 621 (R.I. 2012) (quoting *State v. Wright*, 817 A.2d 600, 610 (R.I. 2003)).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees defendants the right to be confronted with the witnesses against them. *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *State v. Albanese*, 970 A.2d 1215, 1222 (R.I. 2009); *see* R.I. Const., art. 1, § 10 (safeguarding the same right to accused persons). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness * * *." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

However, Confrontation Clause challenges are subject to a harmless-error analysis: "whether, assuming that the damaging potential of the cross-examination

were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684; *see also State v. Doctor*, 644 A.2d 1287, 1290-91 (R.I. 1994) (applying harmless-error analysis in case alleging violations of article 1, section 10 of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution). Factors to consider when undertaking a harmless-error analysis in this context include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Doctor*, 644 A.2d at 1290 (quoting *Van Arsdall*, 475 U.S. at 684). After consideration of defendant's arguments on appeal and the record before us, we determine that the decision of the trial justice to sustain the objection to defendant's inquiry into Emily's motives, even if error, would be, at best, harmless error.

The defendant's argument on appeal is premised on the long-recognized tension between a defendant's right to conduct meaningful cross-examination of the witnesses against them and the public interest in protecting the confidentiality of juvenile records. *See Davis*, 415 U.S. at 319; *State v. Myers*, 115 R.I. 583, 589, 350 A.2d 611, 614 (1976). The Rhode Island General Assembly has codified the public interest in protecting the confidentiality of juvenile records in G.L. 1956 § 14-1-40:

- 20 -

"(a) No *adjudication* upon the status of any child in the jurisdiction of the court shall operate to impose any of the civil disabilities ordinarily resulting from a conviction, nor shall any child be deemed a criminal by reason of that adjudication, nor shall that adjudication be deemed a conviction, nor shall any child be charged with or convicted of a crime in any court, except as provided in this chapter. *The disposition of a child or any evidence given in the court shall not be admissible as evidence against the child in any case or proceeding in any other court*, nor shall that disposition or evidence operate to disqualify a child in any future civil service application, examination, or appointment.

"(b) Any finding of delinquency based upon acts which would constitute a felony, if committed by an adult, shall be available to the attorney general for use in its recommendations to any court in sentencing and that record may be taken into consideration for the purposes of sentencing." (Emphases added.)

The defendant argues that his case is analogous to *Davis*, wherein, after granting a protective order regarding a juvenile witness's record, the trial court prohibited the defendant, who was being tried for theft, from questioning the juvenile witness about his record for burglary and status as a probationer; the defendant sought to demonstrate that the bias and prejudice of the juvenile witness undermined the juvenile witness's identification of the defendant in connection with the theft. *Davis*, 415 U.S. at 311-14. The United States Supreme Court reversed the defendant's conviction and remanded the matter for a new trial, concluding:

"[T]he jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the

juvenile witness's] testimony which provided 'a crucial link in the proof * * * of petitioner's act.' * * * The accuracy and truthfulness of [the juvenile witness's] testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the juvenile witness's] vulnerable status as a probationer, * * * as well as of [the juvenile witness's] possible concern that he might be a suspect in the investigation." *Id.* at 317-18 (quoting *Douglas v. Alabama*, 380 U.S. 415, 419 (1965)).

Unlike the juvenile witness in *Davis*, however, there is no direct or circumstantial evidence in the record before us that there exists an adjudication upon Emily's status related to this or any other matter. The defendant neither proffered any such evidence, filed a pretrial motion, nor sought voir dire, outside of the presence of the jury, to establish that any prior adjudication of her status exists. *See Davis*, 415 U.S. at 310-11; *State v. Manning*, 973 A.2d 524, 536 (R.I. 2009) (noting utility of voir dire examination of the witness at issue in "easily illuminat[ing] the probative value of defendant's suggested line of questioning"). Moreover, there is no suggestion in the record that defendant was previously unaware of Emily's prior arrest and thus lacked an opportunity to seek records of an adjudication upon her status from the Family Court prior to her trial testimony. *Cf. State v. Sorel*, 658 A.2d 505, 506 (R.I. 1995) ("[I]f defendant had been originally informed of the existence of the [juvenile] record he could have taken appropriate steps in the Family Court to have the record made available to him."). Without an adjudication upon Emily's

status related to the shooting, defendant was unable to point to any record for impeachment purposes when Emily testified that she had not been promised anything in exchange for her testimony.

Our harmless-error analysis does not end there. *See Doctor*, 644 A.2d at 1290. We acknowledge the importance of Emily's testimony: She was the first witness called by the state for purposes of establishing that defendant conspired with Skyler and Tyler to commit assault with a dangerous weapon and to commit drive-by shooting; her testimony supported a finding that defendant drove the group to a residential neighborhood and directed Skyler and Corey to look for Marvin; that defendant tried repeatedly to reach Marvin on his cell phone; that she heard defendant, Tyler, and JoJo yell, "shoot 'em"; and that defendant specifically directed Skyler to shoot from the backseat of the Equinox.

The transcript of testimony by Skyler and Tyler nonetheless reveals that they repeated much of what Emily recounted regarding events that occurred after the group left Tyler's house between 11 and 11:30 p.m. on September 12, and that they corroborated Emily's testimony about material events that occurred in the early morning of September 13. Of critical note, Skyler testified that he heard several male voices yelling "shoot" before he fired the Hi-Point 9mm Luger at Marvin, Chris, and Joe from the rear passenger window of the Equinox. Tyler testified that defendant told Skyler, "shoot them" or "just shoot 'em." Skyler and Tyler each also

testified about additional details that further supported a finding that defendant conspired with them to commit assault with a dangerous weapon and drive-by shooting. For example, Skyler testified that defendant "was a little agitated, a little upset" and that defendant wanted to retrieve his keys from Marvin. Tyler similarly testified that defendant wanted to retrieve his keys from Marvin and that defendant stated that he had "an issue" with Marvin. Therefore, although Emily was an important witness for the state, she was not the only witness who could establish that defendant conspired with Skyler and Tyler to commit assault with a dangerous weapon and drive-by shooting. *See Davis*, 415 U.S. at 310, 317-18 (observing that juvenile probationer was "a crucial witness for the prosecution" because he was sole witness who identified the defendant); *State v. Manocchio*, 523 A.2d 872, 875-76 (R.I. 1987) (holding that the error to limit cross-examination was not harmless where witness at issue was the only witness who could link defendant to the fifteen-year-old murders in question and detail his participation in the murders).

The transcript also indicates that "the extent of cross-examination otherwise permitted" to probe Emily's veracity and motive for testifying was significant. *Van Arsdall*, 475 U.S. at 684. The defendant questioned Emily extensively about statements that she made during a November 22, 2021 police interview versus her trial testimony, dissecting her differing accounts of whether and how defendant had directed Skyler to shoot. Importantly and as previously discussed, counsel for

- 24 -

defendant also asked Emily whether she had been promised anything in exchange for her trial testimony; she responded that she had not and testified that she appeared at trial of her own accord.[4]

The state presented a strong case to support a finding that defendant conspired with Skyler and Tyler to commit assault with a dangerous weapon and drive-by shooting in the early morning of September 13, 2020. We conclude that the trial justice did not commit prejudicial error in sustaining the state's objection to defendant's attempt to explore whether the dismissal of charges against Emily motivated her to testify as a witness for the state.

### "Blinky" Statement

Chris testified during direct examination that he drove away from Marvin's mother's house because he heard Marvin on the phone. The trial justice held a sidebar conference to consider a proffer by the state that Chris heard Marvin reference "blinky" while on the phone:

> "[PROSECUTOR]: I anticipate [Chris] eliciting * * * that he hears Marvin reference, 'blinky,' which is slang term for a gun. And then it causes him to pull away from the front of the house, and simultaneously he sees a dark SUV pull up behind him. And I anticipate he will testify that, when he hears the word, 'blinky,' which he knows is a slang term for gun, it prompts him to decide to pull off.
>
> "* * *

---

[4] The state's appendix to its papers submitted to this Court contains a subpoena for Emily to appear at defendant's trial to testify.

"So it's my position that that single statement is a hearsay statement that falls under the state-of-mind exception in that it causes [Chris] to pull off the from the house believing that this vehicle behind him has a gun in the car, therefore, causing him to leave down the street.

"[DEFENSE COUNSEL]: I object. I don't think it's his state of mind. They're trying to elicit that Marvin said something -- excuse me -- that my client said something to Marvin that was overheard * * *. * * * And so it's an out-of-court statement for the truth of the matter.

"* * *

"[PROSECUTOR]: What he's going to say is, oh, you have blinkies, and that, in his mind, in conjunction with the car pulling down the street, causes him to pull off. * * * It simply just causes him to react and pull off, feeling that something is off.

"So it's not being offered for the truth that [defendant] is saying anything, it's simply being offered to show why he's sitting in front of [Marvin's mother's] house and it causes him to leave[.]"

The trial justice allowed the state to question Chris about Marvin's reference to "blinky" over defendant's objection; and the state then asked Chris what prompted him to drive off. Chris replied, "[w]hen Marvin was on the phone with him, he had mentioned something about a blinky[.]" Chris clarified that he did not know to whom Marvin was speaking. He also explained that approximately one minute later, he saw an SUV approaching his vehicle; he testified that he drove off at that moment because he did not feel safe.

The defendant contends that the trial justice abused her discretion when she allowed the state to elicit, through Chris, Marvin's statement about a "blinky" during Marvin's phone call with defendant. He argues that the "blinky" statement was hearsay as defined in Rule 801(c) of the Rhode Island Rules of Evidence, that the statement did not fall within an exception to the hearsay rule, and that its admission was not harmless error. We disagree.

We review a trial justice's evidentiary ruling, including the admission of hearsay evidence, for an abuse of discretion. *State v. Aponte*, 317 A.3d 745, 749 (R.I. 2024).

For a statement to constitute inadmissible hearsay under our rules of evidence, it must be an out-of-court statement offered for the truth of the matter asserted. *Aponte*, 317 A.3d at 750; R.I. R. Evid. 801(c). Such out-of-court statements are inadmissible unless a recognized hearsay exemption or exception applies. *Aponte*, 317 A.3d at 750; R.I. R. Evid. 801(d), 803-04. An out-of-court statement that is not offered for the truth of the matter asserted, but for another purpose, such as showing the effect of the statement upon the listener, is not hearsay. *State v. Oliveira*, 127 A.3d 65, 82 (R.I. 2015).

During the sidebar conference, the state argued that it sought to elicit the "blinky" statement not for the truth of the matter asserted, but rather to show that

hearing "blinky" had the effect of prompting Chris to drive away. It was within the discretion of the trial justice to allow the testimony for this purpose.

The defendant nevertheless emphasizes the state's reference, during the sidebar conference, to the state-of-mind exception and asserts that the state "tried to use totem-pole hearsay" in an attempt to show defendant's state of mind. The defendant argues that the state-of-mind exception under Rule 803(3) of the Rhode Island Rules of Evidence was inapplicable, because the exception would apply to the state of mind of Marvin, who was the declarant. Although it is true that the state initially proffered that the statement "falls under the state-of-mind exception," it also asserted that the statement caused Chris to drive off and that "it's not being offered for the truth that [defendant said] anything * * *." We cannot say that the trial justice abused her discretion in accepting the state's assertion that the statement was not offered for the truth of the matter asserted.

Accordingly, we conclude that the trial justice did not abuse her discretion in allowing Chris to reference "blinky" as a nonhearsay statement during his testimony.

### Motion for a New Trial

The defendant challenges the trial justice's denial of his motion for a new trial based on the weight and sufficiency of the evidence. The defendant specifically argues that the trial justice overlooked and misconceived material evidence, did not independently assess the credibility of the witnesses or the weight and sufficiency

of the evidence, and failed to adequately explain her decision. We see no merit in defendant's arguments.

When a trial justice reviews a motion for a new trial based on the weight of the evidence, she or he must act as a thirteenth juror, exercise independent judgment on the credibility of the witnesses and the weight of the evidence, consider the evidence in light of the jury charge, and determine whether she or he agrees with the verdict or whether reasonable minds could differ. *State v. Chez*, 309 A.3d 1182, 1192 (R.I. 2024). So long as the trial justice completes this analysis and determines that she or he agrees with the verdict, or that reasonable minds could differ, the jury verdict should be affirmed. *Id.* We will not overturn such a determination unless the trial justice committed clear error or overlooked or misconceived material and relevant evidence. *Id.*

Here, the trial justice thoroughly reviewed the evidence, made credibility determinations, and explained the weight she afforded to the testimonies of specific witnesses. The trial justice considered the charge to the jury relating to conspiracy and aiding and abetting, recognizing that those charges formed the crux of defendant's challenge. She determined that the evidence presented "firmly establishe[d]" the following: that defendant drove the group from Tyler's house to Marvin's location; that defendant followed Marvin's vehicle when he pulled away from the house; that defendant and Chris both stopped their vehicles near Fatima

Hospital; that Marvin, Joe, and Chris approached defendant's Equinox; and that Skyler fired several shots from defendant's Equinox, striking Marvin, Chris, and Joe. The evidence also "firmly established[,]" she stated, that Tyler and Skyler's firearms were hidden in a vehicle (the Charger) leased by defendant, and that the group fled to a motel in Massachusetts after the shooting and stayed in rooms paid for by defendant. Finally, in reviewing the testimony of the percipient witnesses present in defendant's Equinox, the trial justice acknowledged the following as further credible evidence establishing defendant's role in the shooting: Emily's testimony that she heard defendant direct Skyler to "do something," and defendant, Tyler, and JoJo say to "shoot 'em"; Tyler's testimony that defendant said to "shoot 'em"; and Skyler's testimony that defendant called Marvin as defendant was following Marvin's vehicle and told him to pull over because defendant had "blinkies."

The trial justice stated that she found Emily, Skyler, and Tyler to be credible witnesses; conversely, she found several of defendant's statements to be implausible. Namely, among other things, she referenced defendant's testimony that the purpose of going to Marvin's mother's house was to retrieve his keys, but that there was no sense of urgency to do something of the sort at midnight, or to do so by following Marvin's vehicle closely, beeping at him, and telling Marvin to pull over to fight; defendant's testimony that no one in his vehicle said anything in the moments before the shooting occurred, finding this statement inconceivable considering the gravity

of what occurred; and defendant's testimony that he met Skyler for the first time on September 12, noting that defendant admitted on cross-examination that he had Skyler's number in his phone. Furthermore, the trial justice observed defendant's behavior, body language, and demeanor on the witness stand to be consistent with untruthfulness. The trial justice remarked that, taking all of this together, she gave little credence to the balance of defendant's testimony. In sum, the trial justice stated that she accepted Tyler, Skyler, and Emily's version of events and rejected defendant's version. The trial justice ultimately determined that Tyler's, Skyler's, and Emily's testimonies were sufficient to support the jury's findings and concluded that she would not have reached a different result.

We reject defendant's argument that the trial justice overlooked or misconceived certain testimony with respect to the credibility of several witnesses. She independently assessed the credibility of the testimony of the state's witnesses as well as the credibility of defendant's testimony. The trial justice acknowledged that Tyler and Skyler had entered pleas before defendant's trial to some of their charges in relation to the shooting, but noted that they readily acknowledged their roles in the shooting and that she nonetheless viewed their testimony as credible. The trial justice additionally noted that there were aspects of Tyler's testimony that lacked credibility, but that his testimony was generally corroborated, in part, by Emily and Skyler. *State v. Jensen*, 40 A.3d 771, 781 (R.I. 2012) (holding that the

existence of some inconsistencies between or among a witness or witnesses do not *ipso facto* render the testimony not credible).

Accordingly, because the trial justice conducted the correct analysis, determined that she would have concluded the same as the jury, and did not otherwise clearly err, we affirm the trial justice's decision denying the motion for a new trial. *Chez*, 309 A.3d at 1192.

## Motion for Judgment of Acquittal

When we are confronted with challenges to the denial of both a motion for a judgment of acquittal and a motion for a new trial, we generally begin by reviewing the motion for a new trial because the burden of proof related to the motion for new trial is more demanding. *Chez*, 309 A.3d at 1189. Thus, if a defendant does not prevail on a motion for a new trial, the challenge to the denial of a motion for a judgment of acquittal also fails. *Id.*

Such is the case here, where defendant challenges the sufficiency of the evidence to support a guilty verdict because, he asserts: (1) the state's dismissals of Skyler and Tyler's conspiracy charges pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure meant that defendant could not be convicted of a conspiracy by himself; (2) the three counts that applied to Marvin should have been dismissed because Marvin did not appear as a witness; and (3) the conspiracy counts

should have been dismissed because, pursuant to *Blockburger v. United States*, 284 U.S. 299 (1932), "there was only one conspiracy" rather than multiple conspiracies.

The defendant's arguments do not alter the fundamental fact that the evidence, viewed in the light most favorable to the state, sufficiently demonstrated defendant's participation in the charged conspiracies and related crimes. The dismissal of charges against Skyler and Tyler under Rule 48(a) does not mandate acquittal. *See State v. Reis*, 815 A.2d 57, 65 (R.I. 2003) (holding that Rule 48(a) dismissals of coconspirators do not preclude a jury finding defendant guilty of conspiracy). Nor did Marvin's absence render the evidence insufficient where other testimony established defendant's involvement in the charged conduct. Finally, the evidence adduced at trial supported the jury's finding that defendant engaged in distinct conspiratorial agreements, each with a unique objective and set of participants.

Accordingly, the defendant's arguments on appeal with respect to the denial of his motion for a judgment of acquittal necessarily fail.

## Conclusion

For the foregoing reasons, we affirm the judgment of conviction and remand the record to the Superior Court.

**Justice Robinson, dissenting.** I dissent. I do so respectfully, but with no small degree of passion.

I accept as a given the fact that the majority has opted not to rule on the issue of whether or not there was a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution (or the Rhode Island analogue thereof, which is set forth in article 1, section 10 of the Rhode Island Constitution). *See State v. Tiernan*, 941 A.2d 129, 132-33, 133 nn. 3 & 4 (R.I. 2008); *see also Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.") (emphasis omitted) (quoting 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940)).[1]

---

[1]     As I read the record in this case, there quite definitely was a violation of defendant's rights under the Confrontation Clause of the United States Constitution and the similar rights recognized by the Rhode Island Constitution. It is clear to me that defendant's lawyer was wrongly foreclosed from conducting cross-examination of Emily as to what her motive or motives may have been for testifying as she did. It is true that such cross-examination probably would have been even *more* potent and effective if defense counsel had obtained the relevant Family Court record to use for impeachment purposes. However, even without the record, defense counsel should have been permitted to cross-examine Emily about *the facts* relative to her arrest and the eventual dismissal of the serious charges that had been levied against her.
    I believe that the trial justice erred in not allowing defense counsel to cross-examine Emily about those *facts* as vigorously as would be permissible. Emily's oral testimony about those facts may well have called into question the credibility of her rather meandering testimony as to what she claimed to have seen and heard as the only front-seat passenger of the vehicle being driven by defendant very late on the night of September 12, 2020 and early on the morning of the next day. However, I see no necessity to expound further on my views in this regard, since the majority has chosen not to rule directly on the Confrontation Clause argument.

- 34 -

And I also accept as a given the following statement from the majority opinion: "After consideration of defendant's arguments on appeal and the record before us, we determine that the decision of the trial justice to sustain the objection to defendant's inquiry into Emily's motives, even if error, would be, at best, harmless error." Accepting, as I must, the fact that the majority has chosen to dispose of this case in that manner, I will mostly confine this dissent to explaining why I am profoundly convinced that the record in this case clearly demonstrates that the limitations placed on defense counsel in his attempt to cross-examine nineteen-year-old Emily cannot properly be characterized as harmless error.[2]

At the outset, it is important to bear in mind the rigorous criterion that governs the harmless error approach to an erroneous evidentiary ruling by a trial court. In the leading case of *Chapman v. California*, 386 U.S. 18 (1967), the United States

---

[2] Even though the majority has decided not to rule directly on the Confrontation Clause issue in this case, I would note that this Court has historically been assiduously vigilant about recognizing the quasi-sanctity of the constitutionally based right to cross-examine and has not been hesitant to reverse a conviction when there has been a violation of the Confrontation Clause and the state has failed to prove *beyond a reasonable doubt* that the trial court's error was truly harmless. *See, e.g.*, *State v. Clark*, 974 A.2d 558, 580 (R.I. 2009) ("After carefully reviewing the record, we are unable to conclude, beyond a reasonable doubt, that the error in this case was harmless."); *State v. Doctor*, 644 A.2d 1287, 1290 (R.I. 1994) (discussing the right to cross-examine as well as the case of *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), and then concluding that "[i]n the present case we cannot find that this error was harmless beyond a reasonable doubt"); *State v. Manocchio*, 523 A.2d 872, 874-75 (R.I. 1987); *State v. Parillo*, 480 A.2d 1349, 1358 n.5 (R.I. 1984).

Supreme Court held that a criminal conviction must be reversed when the appellate court has determined that there was error at the trial court level and cannot say that the error "was harmless *beyond a reasonable doubt*." *Chapman*, 386 U.S. at 24 (emphasis added). That is a truly daunting standard, and I do not believe that it has been satisfied in this case.

I pause to emphasize the enormous importance of cross-examination in the trial of cases. All trial lawyers are aware of that reality, but the point is so important to this dissent that I feel compelled to underline it. The renowned legal scholar John H. Wigmore has described cross-examination as "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1367 at 32 (Chadbourn rev. 1974). In the same vein, the United States Supreme Court has clearly stated: "We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316-17. And this Court has been equally emphatic about the importance of the right of cross-examination: "The right of cross-examination is guaranteed to a criminal defendant because it is the principal means by which the credibility of the witness and the truthfulness of his testimony can be tested." *State v. Parillo*, 480 A.2d 1349, 1357 (R.I. 1984) (internal quotation marks and brackets omitted); *see also Tiernan*, 941 A.2d at 133 ("[T]he right of accused persons to confront the witnesses against

them has ancient and venerable roots, and this Court has ardently protected this right.") (footnote omitted).

Proceeding next to the core of my dissent, I first note that the majority correctly states that "defendant clearly sought to question Emily about whether her motive to testify was related to the dismissal of her own criminal charges; the constitutional basis for his argument was evident from the context of the colloquy that followed the objection by the state."

In my judgment, denying defense counsel in this case the right to cross-examine Emily about her motivation in testifying cannot be reconciled with the above-cited authorities or with the plethora of other decisions to the same effect from this Court and from the federal courts. And I am convinced that the denial of that right in this case was reversible error in view of the importance of Emily's role as a witness for the prosecution. I simply do not understand how one can conclude beyond a reasonable doubt that it was harmless error for the trial justice to bar defense counsel from questioning Emily about the facts pertinent to her arrest and the eventual dismissal of the charges against her.

Even though it will add to the length of this dissent, I feel that it is important to focus on the actual words uttered in the colloquy between defense counsel, the prosecutor, and the trial justice with respect to what defense counsel wished to accomplish in his cross-examination of Emily and what the trial justice foreclosed

him from doing.[3]  The following is what I consider to be the essential part of that

all-important colloquy:

> "[DEFENSE COUNSEL]:  Now, you told us a minute ago that you had gotten handcuffs put on you.
>
> "[THE WITNESS]:  Yes.
>
> "[DEFENSE COUNSEL]:  And were you ultimately arrested?
>
> "[THE WITNESS]:  Not that day.
>
> "[DEFENSE COUNSEL]:  But at some point you were arrested?
>
> "[THE WITNESS]:  Yeah.
>
> "[DEFENSE COUNSEL]:  All right.  And, in fact, do you remember when that was?
>
> "[THE WITNESS]: I don't exactly know the date, but it was like a couple of weeks after.
>
> "[DEFENSE COUNSEL]:  A couple of weeks after the incident?
>
> "[THE WITNESS]:  Yes.
>
> "[DEFENSE COUNSEL]:  All right.  And, as a result of that, you were charged with certain offenses?

---

[3]      I realize that the majority opinion has already quoted a substantial portion of the colloquy (involving defense counsel, the prosecutor, and the trial justice) relative to defense counsel's forcefully asserted wish to cross-examine Emily about her motivation in testifying.  However, I think that it will assist the readers of this dissent to have before their eyes a slightly more inclusive version of that colloquy and of the cross-examination of Emily that preceded the colloquy.

"[PROSECUTOR]:  Objection.

"* * *

"THE COURT: * * * Basis?

"[PROSECUTOR]:  Objection.  I'm asking to go to sidebar on this objection.

"THE COURT: Okay.

"(SIDEBAR CONFERENCE:

"[PROSECUTOR]:  Judge, I'm objecting on the basis that any sort of charge at that time would have been a juvenile court, and would have been sealed, and needs to be disclosed with the permission of the Family Court.  And to my understanding, no such motion has been provided.

"THE COURT: Okay.

"[DEFENSE COUNSEL]:  Judge, all I'm looking to do is establish a motive that, in fact, she was charged with something.  She is charged with the same crimes as this Defendant.  That's all I'm looking for.  I think I'm entitled to get that out through her.

"THE COURT: Well, he's not looking to get in any document, which demonstrates any record that she has of any arrests or disposition.

"[PROSECUTOR]: So at this point, the matter came before the Family Court before I got involved and was ultimately dismissed by the office and then is now under seal.  And it's my understanding that the rules only allow disclosure of Family Court records, any disposition, really, for the purpose of sentencing.  There's no law, statute, or rule that allows any -- the fact that -- even that they were charged, like, say that she was arrested.  But I don't think,

- 39 -

based on the statute and the rule of Family Court, that can come out.

"[DEFENSE COUNSEL]: I'm not looking for her record, I'm looking for her to testify that the fact, the motive for her testimony, was the case was ultimately dismissed.

"THE COURT: But that's the problem, that it is still a record that demonstrates the arrest itself and the dismissal of the case. So you're looking to get in, through her testimony, what you can't get through any documentation.

"[DEFENSE COUNSEL]: I'm not allowed to get the motive for her testifying today?

"THE COURT: I think because she was a juvenile.

"[DEFENSE COUNSEL]: All right. I object to that. I think it's -- I'm entitled. This is cross-examination. She's testifying.

"THE COURT: I understand that, but cross-examination is also within the rules."[4]

The just-quoted language from the trial transcript deserves especially close attention. Defense counsel was quite clear as to what he sought, specifically stating that he wished to probe the issue of Emily's motivation. He first stated: "Judge, all I'm looking to do is establish a motive that, in fact, she was charged with something. She

---

[4]    It is not entirely clear to me what the trial justice meant by her statement that "cross-examination is also within the rules." However, regardless of what the trial justice meant by that statement, it is my view that the constitutional right of confrontation would preempt any provision to the contrary.

- 40 -

is charged with the same crimes as this Defendant. That's all I'm looking for. I think I'm entitled to get that out through her." Shortly thereafter, he explicitly stated: "I'm not looking for her record, I'm looking for her to testify that the fact, the motive for her testimony, was the case was ultimately dismissed." Finally, after the trial justice said that "the problem" was "that it is still a record that demonstrates the arrest itself and the dismissal of the case,"[5] defense counsel asked the trial justice in a rather sardonic manner: "I'm not allowed to get the motive for her testifying today?"

---

[5] Although the focus of this dissent is on the harmless error issue, I feel that I must nevertheless express my strong disagreement with the trial justice's assumption that, because there was a "record" regarding Emily's arrest and the eventual dismissal of charges against her, defense counsel should have been precluded from asking that witness about *the facts* that may be set forth in the record. The actual record may indeed have been a useful piece of evidence if counsel had obtained it, but its existence should not have precluded counsel from asking the witness about *the facts* that may also be set forth in the actual record.

*Facts* exist independently of any *record* that sets forth those same facts in writing. The fact that Pearl Harbor was bombed on December 7, 1941 will remain a fact forever regardless of any written record about that day of infamy. Moreover, I know of no prior restraint or gag order that would bar Emily from responding to the questions that defense counsel wished to put to her. *See generally Martin v. Hearst Corporation*, 777 F.3d 546 (2d Cir. 2015); *cf. Montaquila v. Neronha*, 289 A.3d 568, 578 (R.I. 2023) (Robinson, J., dissenting) ("The sealing statute brings about the sealing of records; it does not mandate the erasure from consciousness of *factual knowledge concerning events that took place* and were known prior to the issuance of the sealing order.") (emphasis added) (footnote omitted).

The trial justice also cited the fact that Emily was a juvenile when the record was made and continued to bar defense counsel from further questioning Emily about the fact of her arrest and the eventual dismissal of charges against her.

Emily's qualifications as a witness for the prosecution were unique. She was a young woman who, as I understand the record, did not have any ongoing connection with the group which tended to spend a good deal of time at Tyler's home—a group that included defendant and Skyler as well as Tyler himself.[6] In fact, it was only fortuitously (*viz.*, the fact that she had a quarrel with her ex-boyfriend earlier in the evening and had sought Tyler's assistance) that she ended up being one of the passengers in the car driven by defendant on the night of the shooting.

Of course, we will never know what would have been the effect on the jury of the cross-examination of Emily if such cross-examination had been permitted.[7] But

---

[6]    According to Emily's own testimony, it seems that the only reason that she was in the company of defendant and the others at the time of the shooting at issue was because she had been in an argument with her ex-boyfriend (one Noah, who lived in West Warwick), and that argument caused her to contact her cousin Tyler, who had an Uber drive her to his house.

[7]    *See State v. Gonzalez*, 136 A.3d 1131, 1158 (R.I. 2016) ("No court can scrutinize the minds of jurors so as to be able to know with certainty what did or did not influence a particular verdict. But the Supreme Court has told us that the state must 'prove, *beyond a reasonable doubt*, that the error complained of (the tainted evidence in this case) did not contribute to the verdict obtained.'") (brackets omitted) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

it is important to bear in mind that Emily's importance to the prosecution's case was very great. She was a young woman in the front seat of the vehicle being driven by defendant; and, in contrast with the status of Tyler and Skyler, there were no charges pending against her at the time of her testimony. The fact that she was positioned in the front seat, where she could easily hear what defendant might have said, and the fact that there were no charges pending against her are factors that might well have caused one or more jurors to consider her to be an especially credible witness. And effective cross-examination[8] of Emily by defense counsel as to her motive for testifying as she did might have well caused one or more jurors to find her *not* to be a credible witness.

The contrast (in terms of whom a juror might find most credible) between Emily on the one hand and Skyler and Tyler is stark. After all, defendant was charged with conspiring with those two men to commit assault with a dangerous weapon. It is entirely possible that one or more jurors might find Emily to be the most credible of the witnesses who were in the car on the night of the shooting.

In my view, the well-known case of *Davis v. Alaska*, 415 U.S. 308 (1974), has been too facilely distinguished by the majority. The holding in that important case

---

[8]   *See State v. Tiernan*, 941 A.2d 129, 133 (R.I. 2008) ("Cross-examination connotes searching and often intense scrutiny. * * * Cross-examination, when well conducted, is not a desiccated syllogistic exercise, but is rather a multifaceted attempt at unveiling what might lie behind the direct testimony of the witness.").

has been succinctly summarized as follows by a subsequent Supreme Court opinion: "[It] concluded that the State's policy [about not permitting the impeachment of a prosecution witness on the basis of his juvenile record] must be subordinated to the defendant's Sixth Amendment right of confrontation." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104 (1979). While I appreciate the state's desire to keep confidential its records concerning possible criminal involvement by juveniles (even one like Emily who was on the cusp of no longer being a juvenile), I believe that, when that laudable policy conflicts with the Confrontation Clause, the latter constitutionally based policy must carry the day. As Chief Justice Burger wrote for the Court in *Davis v. Alaska*: "The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Davis*, 415 U.S. at 320.

No one will ever know what influence on the jurors Emily's responses to the motive-oriented questions that defense counsel was precluded from asking would have had. However, I am persuaded that defense counsel should have been allowed to pose those questions, and I am equally persuaded that precluding him from doing so was a grave error and certainly not harmless error. This Court has expressly stated that "[t]he burden rests with the state to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Terzian*, 162

- 44 -

A.3d 1230, 1244 (R.I. 2017) (internal quotation marks omitted). It is my definite opinion that the state has not successfully borne that burden in this case.

Because of my genuine respect for the members of the Court and for the Court itself, I have made every effort to write this dissent in a temperate tone. Nonetheless, I will conclude this dissent by indicating that, while I do not doubt their good faith, I am somewhat surprised that none of my colleagues shares my conviction that barring defense counsel from questioning Emily in the manner he proposed cannot be called harmless error—in view of the fact that the law requires that, in order to hold that a particular error was harmless, an appellate court must so determine "beyond a reasonable doubt." *Chapman*, 386 U.S. at 24; *see also Gonzalez*, 136 A.3d at 1156 ("The harmless error principle specifically requires 'the beneficiary of a constitutional error to *prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained*.'") (quoting *Chapman*, 386 U.S. at 24) (emphasis in original).

Defense counsel made it crystal clear that his goal was to establish a motive as to why Emily was testifying as she did, taking into account the fact that she had at one time been charged. In my view, the trial justice erred when she sustained the prosecutor's objection that resulted in defense counsel being unable to pursue that line of cross-examination; and I remain convinced that that error was not harmless. The precluded cross-examination of Emily, an important witness for the prosecution,

- 45 -

may well have caused one or more jurors to have real doubts as to Emily's overall credibility.  We will never know!

For these reasons, I dissent—respectfully, but also ruefully.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Matthew Peckham. |
| **Case Number** | No. 2023-75-C.A.<br>(P2/21-1544CG) |
| **Date Opinion Filed** | July 30, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Sean P. Malloy<br>Department of Attorney General |
| | For Defendant:<br><br>Jodi M. Gladstone, Esq. |